*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARK MILLER; COALITION OPPOSED TO
ADDITIONAL SPENDING & TAXES; and
WEDEMANDAVOTE.COM,
　　　　　　　　　*Plaintiffs-Appellees,*

　　　　*v.*

CITY OF CINCINNATI; MILTON R. DOHONEY;
and JOEL KOOPMAN,
　　　　　　　　　*Defendants-Appellants.*

No. 08-4679

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 08-00550—Michael R. Barrett, District Judge.

Argued: November 17, 2009

Decided and Filed: September 24, 2010

Before: DAUGHTREY, COLE, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Paula Boggs Muething, CITY OF CINCINNATI, OFFICE OF THE SOLICITOR, Cincinnati, Ohio, for Appellants. Christopher P. Finney, FINNEY STAGNARO SABA & PATTERSON CO., LPA, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Paula Boggs Muething, CITY OF CINCINNATI, OFFICE OF THE SOLICITOR, Cincinnati, Ohio, for Appellants. Christopher P. Finney, FINNEY STAGNARO SABA & PATTERSON CO., LPA, Cincinnati, Ohio, Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Amelia, Ohio, for Appellees. Dale D. Cook, WILES, BOYLE, BURKHOLDER & BRINGARDNER CO. L.P.A., Columbus, Ohio, for Amicus Curiae.

———————————

## OPINION

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge**.**  In this section 1983 action, the plaintiffs, two political advocacy groups and an individual member of one of the groups, claim that defendant City of Cincinnati's regulation governing access to the interior spaces of city hall violates the First and Fourteenth Amendments of the United States Constitution.  After ruling in the plaintiffs' favor on a jurisdictional challenge by the defendants, the district court granted the plaintiffs' motion for a preliminary injunction.  The district court concluded that the plaintiffs had established a substantial likelihood of success on the merits of four independent claims: that the challenged regulation (1) unconstitutionally prevented the plaintiffs from accessing city hall for protected-speech activities; (2) unconstitutionally restricted the plaintiffs' right of expressive association by forcing them to collaborate with a government official to gain access to city hall; (3) allowed discriminatory suppression of speech in violation of the Equal Protection Clause; and (4) was void for vagueness under the Due Process Clause. The defendants now appeal.

For the reasons that follow, we conclude that the district court correctly found it had jurisdiction to rule on the plaintiffs' motion for a preliminary injunction.  The district court was also correct in holding that the plaintiffs have established a substantial likelihood of success on two of their four claims on which they based their motion: that the City's regulation violates the plaintiffs' right to free speech and that it is unconstitutionally vague.  We therefore affirm.

### I.  FACTUAL AND PROCEDURAL BACKGROUND

The principal plaintiff, Coalition Opposed to Additional Spending & Taxes (COAST), is an Ohio political action committee that takes positions on a variety of non-partisan issues, including – in this case – opposition to the Cincinnati City Council's authority to implement an automated photo-monitoring program to enforce traffic

regulations.  Plaintiff Mark Miller is an individual member of COAST, and COAST, in turn, participates in WeDemandAVote.Com, a political coalition advocating "participatory democracy."  The defendants include the City of Cincinnati, city manager Milton Dohoney, and the city facilities manager, Joel Koopman.

COAST twice tried and twice failed to gain access to the interior stairs and the lobby of Cincinnati's city hall to hold a press conference and rally advocating its views. The City denied COAST's first request under the then-controlling version of Administrative Regulation #5, which provided in relevant part:

> This administrative regulation is designed to restate and clarify longstanding City policies regarding the use of public buildings . . . .
>
> No private business enterprises or solicitations should be permitted in City buildings or operated therefrom. Exceptions should be made only by specific approval of the Department Head when it is judged to be in the public interest, as in the case, for example, of the United Way Campaign.
>
> No private signs or advertising materials should be displayed on or in City buildings unless for an approved public purpose authorized by the Department Head.
>
> . . .
>
> In making any exceptions to the above policies, Department Heads are urged to consider not only what is proper, but also how it appears to the public.

In the letter denying COAST's request, defendant Koopman noted that "the use of any City facility is for conducting business related to the functions of our various departments in serving the citizens and by City Council in the performance of their duties."  Koopman further explained:

> City Facility Management's practice is that events held inside the building require a City sponsor, either a Council Member or a department as part of their regular business and duties. Private groups, unaffiliated with any department or Council Member, are allowed to use the outside stairs as long as our egress is not blocked.

Koopman encouraged COAST to seek out a city department or city council member willing to sponsor a press conference and rally inside city hall or, in the alternative, to hold the event on the exterior steps.

In fact, various private groups had held events inside city hall through sponsorship by a department official or city council member under the regulation. Most notably, the backers of a tax levy for Cincinnati's public school system, which is governed by an independent school board and not the city council, held a rally on the indoor stairs of city hall that featured city council members and representatives of private community groups as speakers. The Coalition for Community Values, a private group, arranged through the office of a city council member to use a conference room in city hall for a press conference calling on a local newspaper to stop accepting adult-entertainment advertisements. No city council member was present at that press conference; however, two aides to city council members did attend, although they did not speak.

In addition, the plaintiffs submitted as exhibits calendars that reflected use of the lobby and first floor staircase for charitable campaigns such as the United Way and for art and holiday displays. Conference rooms were booked for various non-profit events and fund-raisers, meetings of the American Society for Public Administrators, the Soccer Committee, Keep Cincinnati Beautiful (a city contractor), and the Earned Income Tax Credit Partnership/Make Work Pay, lectures relating to heart health, and the "Who Killed Our Kids?" campaign. City council chambers were used for such purposes as youth mock-trial activities and recognition ceremonies, Truman Scholarship interviews, concerts, a United Way event, a government-day program put on by the local chamber of commerce, and sessions of Leadership Cincinnati.

After COAST filed the instant action, the City revised Administrative Regulation #5 to provide in relevant part:

> City Hall is lawfully dedicated for the purpose of allowing City officials
> to exercise the rights and responsibilities specified in the Charter of the
> City of Cincinnati.

. . .

> The interior spaces of City Hall are reserved for use by the Mayor, the City Manager and his assistants, City Councilmembers, City Department Directors, City Commissions and Boards, and City employees. The interior of City Hall is open to the public for purposes of visiting City officers and attending City Council and other public meetings. The interior of City hall is not generally available to the public for other purposes.

> When the Mayor, City Manager and his assistants, City Councilmembers, City Department Directors, and City Commissions and Boards intend to use interior spaces of City Hall for assemblages, they should notify the Facilities Management Division of the Public Services Department . . . .

> Facilities Management is responsible for insuring that the assemblage does not create security problems, unreasonably interfere with ingress or egress from City Hall, or otherwise unreasonably interfere with the other official uses occurring inside City Hall.

Under the revised regulation, the term "assemblages" apparently includes rallies and press conferences. City manager Dohoney instructed Koopman not to schedule any assemblages in the interior front lobby or interior stairs.

In the district court the parties stipulated that the revised regulation shares several similarities to the policy and practice under former Administrative Regulation #5. Under both, private groups seeking to hold rallies or press conferences inside city hall must "politically or administratively collaborate with the Mayor, a member of the Cincinnati City Council, the City Manager and his assistants, a City Department Director, or a City Board or Commission." The authorized official who "sponsor[s] the use" of city hall by a private group, however, does "not necessarily need to attend the use and/or participate in the use in order for it to proceed." City officials have "full and independent discretion" as to whether they will collaborate with an outside group. Private advocates on one side of a public issue might secure sponsorship for a rally inside city hall, while advocates of the opposing viewpoint on the same issue might be denied access.

When the plaintiffs filed suit, they sought a preliminary injunction preventing the City from regulating access to city hall on the basis of the content or viewpoint of a proposed activity or from continuing to use an ad hoc, discretionary method of granting

access to the building.  The plaintiffs also asked the district court to order the City to allow the plaintiffs to hold a rally inside city hall.  The district court granted the plaintiffs' motion for a preliminary injunction, but the district court's order does not specify whether its effect is to close city hall to outside groups regardless of sponsorship or to grant the plaintiffs access.  In any event, the district court granted the City's motion to stay the preliminary injunction pending the instant appeal.

## II. DISCUSSION

On appeal, the defendants raise two issues.  They first challenge the district court's subject matter jurisdiction, arguing that the plaintiffs lack standing because they suffered no actionable injury and that their claims are both unripe for review and moot. The defendants also contend that the district court erred in finding that the plaintiffs' claims are substantially likely to succeed on the merits.

### A. Subject Matter Jurisdiction

"The issue of standing, and whether a federal court has the power to adjudicate a suit, is 'the threshold question in every federal case.'" *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  We review jurisdictional challenges based on standing, ripeness, and mootness *de novo. See Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 278 (6th Cir. 2009) (standing); *In re Cassim*, 594 F.3d 432, 437 (6th Cir. 2010) (ripeness); *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009) (mootness).

### 1. Standing

As to standing, the City argues that because the plaintiffs did not seek out and fail to secure sponsorship from an authorized official, they have not suffered the requisite injury in fact.  The district court concluded that the plaintiffs suffered an injury when the City denied their request for access and told them to find a sponsor.  We agree.

A plaintiff has constitutional standing if he: (1) shows a concrete and actual or imminent injury in fact; (2) demonstrates that the defendant's conduct caused the injury;

and (3) shows that it is likely, as opposed to merely speculative, that a favorable decision will redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Additionally, courts have recognized three prudential limitations on standing, requiring that "plaintiff be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 403 (6th Cir. 1999) (quoting *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir. 1991)); *see also Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (prudential standing requirements summarized).

When the City instructed the plaintiffs to secure a sponsor, the City placed the plaintiffs' request at the mercy of the unfettered discretion of those officials authorized to grant access. But, as the district court observed, the Supreme Court has held that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755-56 (1988). Because unfettered governmental discretion over the licensing of free expression "constitutes a prior restraint and may result in censorship," a plaintiff may bring facial challenges to statutes granting such discretion "even if the discretion and power are never actually abused." *Id.* at 757.

In our view, both the original and revised versions of Administrative Regulation #5 afford authorized officials precisely this kind of unfettered discretion in deciding whether to sponsor an event in the interior of city hall. The defendants attempt to distinguish *City of Lakewood*, arguing that it involved a discretionary speech restriction on a public sidewalk rather than inside a government building. This distinction is irrelevant, however, because in *City of Lakewood* the Court held that an arbitrary prior restraint on protected speech provides standing regardless of the forum. Hence, when a plaintiff's protected-speech activities are subject to restriction at the government's

unfettered discretion, the plaintiff has suffered an injury in fact.  We thus conclude that in this case the plaintiffs have standing to sue.

**2. Ripeness**

Next, the City argues that the plaintiffs' claim is not ripe because the plaintiffs have not sought collaboration with any individual authorized officials.  We disagree.

The ripeness doctrine prevents courts from "entangling themselves in abstract disagreements" through premature adjudication. *Grace Community Church v. Lenox Twp.*, 544 F.3d 609, 615 (6th Cir. 2008).  Courts consider three factors to evaluate ripeness: "(1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Id.* (quoting *Warshak v. United States*, 490 F.3d 455, 467 (6th Cir. 2007)).

Because the plaintiffs' claims are directed at the sponsorship requirement itself and do not allege that officials, in practice, exercise their discretion to grant sponsorship in a discriminatory manner, their claims are ripe.  COAST has been twice denied access to city hall for noncompliance with the sponsorship requirement and has therefore been harmed.  Moreover, the factual record is sufficiently developed because the parties have stipulated to the fact that both versions of Administrative Regulation #5 require political or administrative collaboration with an authorized official and that the authorized officials have full and independent discretion to sponsor private groups and individuals, giving them access to the interior of city hall.  Obviously, refusing consideration until the plaintiffs have actually sought collaboration with each and every possible collaborator in city hall would cause undue and unnecessary hardship.  We therefore conclude that the challenge to the sponsorship requirement is ripe for review.

**3. Mootness**

Finally, the City argues that the plaintiffs' claims are moot because, following the enactment of revised Administrative Regulation #5, the city manager requested that authorized officials not schedule assemblages in the interior front lobby and stairs of city hall. Nevertheless, the plaintiffs' claims remain viable to the extent that they seek nominal damages as a remedy for past wrongs. *See Murray v. Bd. of Trustees, Univ. of Louisville*, 659 F.2d 77, 79 (6th Cir. 1981). In addition, the City does not dispute the fact that COAST's claim remains viable because other interior areas of city hall are accessible for sponsored events under the revised version of Administrative Regulation #5.

Accordingly, we conclude that the district court properly exercised subject matter jurisdiction over the plaintiffs' action.

**B. Likelihood of Success on the Merits**

Under well-developed authority, federal district courts balance the following factors in addressing motions for a preliminary injunction: "(1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (reviewing a preliminary injunction granted on First Amendment grounds). In this case, the defendants challenge the district court's ruling that there is a substantial likelihood that the plaintiffs will succeed on their free speech, expressive association, equal protection, and void-for-vagueness claims. On appeal, we review the grant of a preliminary injunction for abuse of discretion. *See id.* A district court abuses its discretion in this regard when it "relies upon clearly erroneous findings of fact, improperly applies the governing law, or uses an erroneous legal standard." *Id.*

**1. First Amendment Free Speech Claim**

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. Amend. I. Simply because the government may own a piece of property, however, does not mean that property is open to all types of expressive activity at all times. "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use which it is lawfully dedicated." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). To determine the constitutionality of a government restriction on speech on publicly-owned property, we consider three questions: (1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; (3) whether the restriction on speech in question satisfies the constitutional standard for the forum. *See S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553, 559 (6th Cir. 2007).

**a. Forum Analysis**

There is no question that the plaintiffs' proposed press conference and rally are expressive activities protected under the First Amendment. The more challenging question is what kind of forum City Hall's interior constitutes. The Supreme Court has recognized three types of public fora: the traditional public forum, the designated public forum, and the limited public forum. *See Pleasant Grove v. Summum*, 129 S. Ct. 1125, 1132 (2009). A nonpublic forum, in contrast, is a government-owned property that is not by tradition or governmental designation "a forum for public communication." *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007). The type of forum determines the applicable constitutional standard for restrictions on expressive activities. *See Summum*, 129 S. Ct. at 1132.

**i. Traditional Forum**

Traditional public fora include sidewalks, parks, and other areas that by "tradition or by government fiat" are open to public assembly and debate. *Helms*, 495 F.3d at 255 (quoting *Perry*, 460 U.S. at 45). Restrictions on speech in a traditional

public forum receive strict scrutiny; the government may exclude a speaker from a such a forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

If a publicly-owned property is not a traditional public forum, heightened First Amendment scrutiny is not automatic. *See id.*, 473 U.S. at 800-801. A government may, however, transform a publicly-owned property into a public forum by making it "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* at 802. A government "does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id.* Governmental intent is the "touchstone" of a court's analysis in determining whether it has created a public forum. *Kincaid v. Gibson*, 236 F.3d 342, 348-349 (6th Cir. 2001) (en banc). To determine governmental intent, courts "look to the government's policy and practice with respect to the forum as well as to the nature of the property at issue and its 'compatibility with expressive activity.'" *Id.* at 349 (quoting *Cornelius*, 473 U.S. at 802).

## ii. Designated Forum

The government creates a designated public forum when it opens a piece of public property to the public at large, treating as if it were a traditional public forum. *See Parks v. Finan*, 385 F.3d 694, 695-696, 699 (6th Cir. 2004) (grounds of state capitol, opened by state government for public expressive activities on a permit system, are either a traditional public forum or designated public forum); *Church of the Rock v. City of Albuquerque*, 84 F.3d 1273, 1278 (10th Cir. 1996) (city-owned senior center is a designated public forum because, although "not a traditional location of public debate or assembly," the city opened it "to the public for discussive purposes" by permitting "lectures and classes on a broad range of subjects by both members and non-members"). As the Supreme Court held in *Summum*, "Government restrictions on speech in a

designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." 129 S. Ct. at 1132 (citing *Cornelius*, 473 U.S. at 802).

### iii. Limited Forum

A government entity may "create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Summum*, 129 S. Ct. at 1132. In *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 102-03, 106-07 (2001), the Supreme Court held that a public school created a limited public forum when it opened its building after hours for public meetings, subject to the permission of the administration. The government may restrict speech in a limited public forum as long as the restrictions do "not discriminate against speech on the basis of viewpoint" and are "reasonable in light of the purpose served by the forum." *Id.* at 106-07; *see also Summum*, 129 S. Ct. at 1132.[1]

### iv. Nonpublic Forum

By contrast, a nonpublic forum is a publicly-owned property that is not by tradition or governmental designation "a forum for public communication." *Helms*, 495 F.3d at 256. The government may limit access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* (quoting *Cornelius*, 473 U.S. at 806). In *Helms*, for example, we concluded that the reception area of a judge's office was a nonpublic forum despite the judge's "open-door policy" designed to accommodate individual members of the public to visit his office to speak with him. *Id.* at 256-57. The "small reception area" was only eight feet from an office suite the judge

---

[1]In *Summum*, the Supreme Court clarified that the designated public form and the limited public forum are distinct forum types and that restrictions on speech in a limited public forum receive lesser scrutiny than those in a designated public forum. 129 S. Ct. at 1132. This ruling resolves the confusion over terminology and scrutiny levels noted by this court and others after the Supreme Court first articulated the concept of a "limited public forum" in *Good News Club. See Gilles v. Garland*, 281 F. App'x 501, 513 (6th Cir. 2008) (J. Moore, concurring); *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 750 (6th Cir. 2004) (noting confusion about terminology and proper scrutiny levels but declining to "delve deeply into the nuances of designated versus limited public forums" because it was unnecessary to the holding); *Citizens for Community Values, Inc. v. Upper Arlington Public Library Bd. of Trs.*, 2008 WL 3843579, at *5 n.3 (S.D. Ohio 2008) (noting confusion in the Sixth Circuit and elsewhere about terminology and proper scrutiny levels).

shared with several other county officials. *Id.* at 257. We held that the judge did not intend "to create a public 'forum for expressive activity'" open to "prolonged sit-ins" simply by making himself accessible to individuals seeking to discuss public matters with him. *Id.*

In this case, by opening the interior spaces of Cincinnati's city hall to private groups under the aegis of Administrative Regulation #5, the City has not created a traditional public forum because the regulation does not make City Hall's interior space as open to public discourse as a sidewalk or park. Nor does the regulation allow the City to treat that space as a designated public forum. Instead, Administrative Regulation #5 has created, at most, a limited public forum like that described in *Good News*. Moreover, even if we were persuaded by the City's argument that the regulation, as revised, creates only a nonpublic forum,[2] the result would be the same, because government limitations on speech in both a limited public forum and a nonpublic forum receive the same level of scrutiny. In both instances, any restrictions must be "reasonable and viewpoint neutral." *Summum*, 129 S. Ct. at 1132; *see also Helms*, 495 F.3d at 256.

Because the requirement of sponsorship or collaboration in this case is facially viewpoint neutral, the remaining issue is whether the requirement is reasonably related to the purpose of the forum. The stated purpose of the forum is to allow city officials to

---

[2]The City argues that under the Supreme Court's ruling in *Ysursa v. Pocatello Educational Association*, 129 S. Ct. 1093, 1098 (2009), government restrictions on speech in nonpublic fora receive only rational basis review and need not be viewpoint-neutral. We reject this argument because the Court's reasoning in *Ysursa* is entirely unrelated to forum analysis. In that case, the Court upheld Idaho's decision to ban local government employers from allowing union payroll deductions for political purposes against a First Amendment challenge. *See id.* at 1097-98. The Court observed that the state is "not required to assist others in funding the expression of particular ideas, including political ones," and noted that a state's decision not to do so by permitting payroll deductions "is not an abridgement of the union's speech" but, rather, the state's refusal to be enlisted in support of the union's speech activities. *Id.* at 1098. Because a government's "decision not to subsidize the exercise of a fundamental right does not infringe the right," the court applied rational basis review to plaintiff's claim. *Id.*

The Court's opinion in *Ysursa*, however, has no bearing on the scrutiny level applicable to Administrative Regulation #5, because the *Ysursa* Court did not engage in forum analysis in order to resolve the First Amendment dispute in that case. Hence, we reject the City's attempt to characterize COAST's request to access city hall for its rally as a request that the City subsidize its political speech by providing space. Of course, the City could altogether close the interior spaces of city hall to expressive activities by private groups if it chose to do so. The City, however, maintains a policy permitting private groups to engage in speech activities in City Hall with the discretionary sponsorship of authorized officials. As long as this policy exists, forum analysis applies.

exercise their rights and responsibilities under the City Charter. But, Administrative Regulation #5 permits authorized officials to open spaces in city hall to private parties for events that they do not attend or assist in organizing. As a result, the sponsorship or collaboration requirement, as drafted, bears little relationship to any official duties under the City Charter. We therefore hold that the district court did not abuse its discretion in concluding that plaintiffs have shown a likelihood of success on the merits of their facial First Amendment challenge to the sponsorship requirement under the public forum doctrine.

**b. Governmental Speech**

On appeal, the City raises for the first time an argument that events inside city hall are exempt from First Amendment scrutiny altogether because they represent "government speech." This claim arises from the Supreme Court's recent decision in *Pleasant Grove v. Summum*, a 2009 opinion that was released after the district court issued the preliminary injunction and the City filed its notice of appeal. *See* 129 S. Ct. 1125, 1132 (2009). We conclude that this argument fails on its merits.

In *Summum*, a public park erected a donated Ten Commandments monument but rejected a monument representing another religious organization's tenets. *Id*. at 1129-30. The court found no constitutional violation, holding that the First Amendment "does not regulate government speech," and that a government entity is entitled to "select the views that it wants to express." *Id*. at 1131. In so holding, however, the court affirmed that "[w]hile government speech is not restricted by the Free Speech Clause, the government does not have a free hand to regulate private speech on government property." *Id*. at 1132. In concluding that the Ten Commandments monument was government speech rather than private speech on government land, the court noted that "[g]overnments have long used monuments to speak to the public" and that the public reasonably interprets "privately financed and donated monuments that the government accepts and displays to the public on government land" as conveying the government's views. *Id.* at 1133. *See also ACLU v. Bredesen*, 441 F.3d 370, 375 (6th Cir. 2006) (holding that a "Choose Life" license plate is government speech for First Amendment

purposes because "the government determines [the] overarching message and retains the power to approve every word disseminated") (citing *Johanns v. Lifestock Mktg. Ass'n*, 544 U.S. 550, 560-61 (2005)).

Under the Court's reasoning in *Summum*, the activities that take place in Cincinnati's city hall are not "government speech." Although government speech may involve private individuals, the connection between the events that take place inside city hall under Administrative Regulation #5 and any official government views is simply too attenuated. As we have noted, sponsoring city officials need not be involved directly in the activities that take place in city hall. Moreover, no one can reasonably interpret a private group's rally or press conference as reflecting the government's views simply because it occurs on public property. Historically, governments have exercised strong "editorial control over donated monuments," *Summum*, 129 S. Ct. at 1133, while private individuals can apparently access the interior of Cincinnati's city hall for assemblages on the whim of any authorized official.

Thus, we conclude that the doctrine of government speech does not prevent applying First Amendment scrutiny in this case.

**2. First Amendment Expressive Association Claim**

The district court held that the plaintiffs have shown likely success on their claim that the sponsorship requirement violates the First Amendment right of expressive association. Applying strict scrutiny, the district court reasoned that in requiring collaboration with city officials, "Administrative Regulation #5 forces groups, such as COAST, to accept members it does not desire" and concluded that "there are means significantly less restrictive of associational freedoms by which Defendants could control the use of the interior of City Hall." The City argues that the district court erred because that Administrative Regulation #5 does nothing to interfere with COAST's membership. We agree.

The First Amendment extends beyond the right to speak to encompass the "right of expressive association," *i.e.*, the "right to associate for the purpose of speaking."

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006). The right protects "a group's membership decisions" and also protects against laws that make "group membership less attractive" without "directly interfer[ing] with an organization's composition," such as requiring groups to disclose their membership lists or imposing penalties "based on membership in a disfavored group." *Id.* at 69 (citing *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 101-02 (1982); *Healy v. James*, 408 U.S. 169, 180-84 (1972)). "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

In analyzing an expressive association claim, courts use a three-step process. The first determination is whether a group is entitled to protection. *See id.* at 655. A group need not associate "for the 'purpose' of disseminating a certain message" to be protected; it is enough that a group "engage[s] in expressive activity that could be impaired." *Id.* Political advocacy groups like COAST are the paradigmatic expressive associations entitled to protection. Second, courts ask whether the government action in question "significantly burden[s]" the group's expression, affording deference "to an association's view of what would impair its expression." *Id.* at 653. Lastly, the government's interest in any restriction must be weighed against plaintiff's right of expressive association. *See id.* at 656.

A government action does not interfere with the right of expressive association unless it directly or indirectly interferes with group membership. In *Forum for Academic & Institutional Rights*, the Supreme Court held that requiring law schools to allow military recruiters on campus as a condition of receiving federal funds did not significantly burden associational rights because "[r]ecruiters are, by definition, outsiders who come onto campus for the limited purpose of trying to hire students." 547 U.S. at 69. The statute at issue, therefore, did not "force a law school 'to accept members it does not desire.'" *Id.* The right of expressive association does not shield

groups from mere "interaction" with non-members, and a group cannot invoke it simply by claiming interaction "would impair its message." *Id.* (quoting *Dale*, 530 U.S. at 653).

In this case, the plaintiffs' expressive association claim fails because nothing in Administrative Regulation #5 affects the internal membership decisions of groups seeking to use city hall for expressive activities. Officials who "sponsor" or "collaborate" with groups to use the interior spaces do not become members of the group – they are outsiders with whom groups must interact only for the limited purpose of accessing the city hall space. Indeed, Administrative Regulation #5 requires so little interaction that the sponsoring official apparently need not help organize or even attend a sponsored event. Administrative Regulation #5, therefore, does not "significantly burden" COAST's constitutional right of association, and the district court erred in concluding that the plaintiffs' expressive association claim is substantially likely to succeed.

**3. Equal Protection Claim**

The district court also concluded that the plaintiffs had shown likely success on their equal protection claim. Applying strict scrutiny, the district court held that Administrative Regulation #5 was not narrowly tailored to effect a compelling government interest. On appeal, the defendants argue that the district court erred in applying strict scrutiny and that plaintiffs have no cognizable equal protection claim. We agree.

The Equal Protection Clause "protects against invidious discrimination among similarly situated individuals or implicating fundamental rights." *Scarbrough v. Morgan City Bd. of Ed.*, 470 F.3d 250, 260 (6th Cir. 2006). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Id.* Strict scrutiny is appropriate only if a classification "infringes on a class of people's fundamental rights [or] targets a member of a suspect class." *Id.*

Neither the plaintiffs nor the district court provide more than cursory analysis of why plaintiffs' equal protection claim should receive strict scrutiny. The classification at issue is, presumably, those groups who collaborate with authorized officials to access city hall and those who do not. But because such "collaborators" and "non-collaborators" are not suspect classifications, strict scrutiny is appropriate only if the classification infringes on fundamental rights.

We conclude that strict scrutiny is inapplicable in this case. The sponsorship requirement under Administrative Regulation #5 is minimal because an official need not be actively involved with an event to sponsor it. Under the public forum doctrine described above, government officials may open publicly-owned spaces to "certain groups or for the discussion of certain topics." *Good News Club*, 533 U.S. at 106-07. Granting access to one group and not another inevitably involves classification – those invited into the forum and those who are not. The forum analysis applied above assumes such classification but does not extend strict scrutiny to limited public fora and nonpublic fora. The appropriate First Amendment standard in this case is viewpoint neutrality and rational relationship to the purpose of the forum, not strict scrutiny. *Id.*

Thus, the district court erred in applying strict scrutiny to determine whether plaintiffs had shown a likelihood of success on their equal protection claim.

**4. Void-For-Vagueness Claim**

The district court concluded that COAST has shown a substantial likelihood of success on its claim that Administrative Regulation #5 is unconstitutionally vague. We agree.

In pursuing a void-for-vagueness claim, a plaintiff must establish to a court's satisfaction that "[a regulation's] prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *United Food & Commercial Workers Union Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 358-59 (6th Cir. 1998) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). The void-for-vagueness doctrine not only

ensures that laws provide "fair warning" of proscribed conduct, but it also protects citizens against the impermissible delegation of basic policy matters "for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *UFCW*, 163 F.3d at 358-59 (citing *Grayned*, 408 U.S. at 108-109). Without "clear standards guiding the discretion of public officials" with enforcement authority, there is a risk that those officials will "administer the policy based on impermissible factors." *UFCW*, 163 F.3d at 358-59. As a result, laws or regulations that, for example, give officials "unbridled discretion over a forum's use" are impermissible because of the "danger of censorship and of abridgement of our precious First Amendment freedoms." *Id.* A statute that fails to constrain "an official's decision to limit speech" with "objective criteria" is unconstitutionally vague. *Id.*

In *UFCW*, for example, we held that a policy governing the selection of advertisements for city busses was unconstitutionally vague on its face. *Id.* at 363. The policy prohibited "controversial" advertisements and required those selected to be "aesthetically pleasing" without any further guidance as to the meaning of these criteria. *Id.* at 359-60. We held that these terms were so vague that they gave officials "the power to deny a proposed ad that offends the officials' subjective beliefs and values under the guise that the ad is aesthetically displeasing [or controversial]." *Id.* at 360. Because of this "danger of arbitrary and discriminatory application," the court in *UFCW* found that the plaintiff's due process challenge was substantially likely to succeed on the merits. *Id.*

In this case, Administrative Regulation #5 provides even less guidance to officials than the advertising policy in *UFCW*. The parties stipulate that the revised version of Administrative Regulation #5, as did the original, gives complete discretion to council members and department heads to select whom they will sponsor. The only direction provided is that the purpose of the interior of city hall is to allow City officials "to exercise the rights and responsibilities specified in the Charter of the City of Cincinnati." Without further specificity, this directive offers no meaningful guidance.

We conclude that the plaintiffs have established a substantial likelihood of success with regard to the merits of their void-for-vagueness claim.

### III.  CONCLUSION

Because the plaintiffs have established a substantial likelihood of success on their free speech and void-for-vagueness claims, there appears to be no issue as to the existence of the remaining preliminary injunction factors.  As we have previously noted, "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."  *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989).  When a constitutional violation is likely, moreover, the public interest militates in favor of injunctive relief because "it is always in the public interest to prevent violation of a party's constitutional rights."  *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

We therefore conclude that the district court properly enjoined enforcement of Administrative Regulation #5 on the basis of the plaintiffs' free speech and void-for-vagueness claims. On these grounds, we AFFIRM the order of the district court and REMAND the case for further proceedings.