RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0162p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHRIS HARTMAN; SONJA DEVRIES; CARLA WALLACE,
　　　　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

JEREMY THOMPSON; JASON DRANE; BRIAN HILL,
　　　　　　　　　　*Defendants-Appellees*.

No. 18-5220

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:16-cv-00114—Gregory N. Stivers, Chief District Judge.

Argued: October 4, 2018

Decided and Filed: July 23, 2019

Before: SUHRHEINRICH, MOORE, and BUSH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael L. Goodwin, Louisville, Kentucky, for Appellants. Charles C. Haselwood, II, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Michael L. Goodwin, Louisville, Kentucky, for Appellants. Charles C. Haselwood, II, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellees.

SUHRHEINRICH, J., delivered the opinion of the court in which BUSH, J., joined in part and in the judgment. BUSH, J. (pp. 18–19), delivered a separate opinion concurring in part and in the judgment. MOORE, J. (pp. 20–36), delivered a separate dissenting opinion.

—————————————

**OPINION**

—————————————

SUHRHEINRICH, Circuit Judge.    Chris Hartman, Sonja DeVries, and Carla Wallace (collectively, "Plaintiffs") are members of an organization called The Fairness Campaign.    In 2015, they protested the annual Ham Breakfast at the Kentucky State Fair because it was sponsored by the Kentucky Farm Bureau Federation ("KFB").    Plaintiffs were allowed to protest in a designated zone.    Eventually, Plaintiffs were arrested for causing a disruption, and they sued Kentucky State Troopers Jeremy Thompson, Jason Drane, and Brian Hill (collectively, "Defendants") for a variety of constitutional and state law claims.    The district court granted summary judgment to Defendants.    We **AFFIRM**.

## I.  BACKGROUND

On August 27, 2015, the KFB sponsored the 52nd annual Ham Breakfast at the Kentucky State Fair.    To gain admission to the Ham Breakfast, attendees had to buy two tickets—one to get into the Fairgrounds and a separate ticket for the Breakfast.

On August 26, 2015, the day before the Ham Breakfast, The Fairness Campaign, the American Civil Liberties Union of Kentucky, and the Jefferson County Teachers Association (referred to here as "The Fairness Campaign") e-mailed a joint press release.    The press release stated that The Fairness Campaign "will protest the [KFB]'s discriminatory policies at the annual State Fair Country Ham Breakfast Thursday, August 27, 7:00 a.m. in South Wing B of the Kentucky Exposition Center."    The Fairness Campaign described KFB's discriminatory policies as "anti-LGBT, anti-teacher, anti-union, anti-choice, and pro-death penalty, among others."

Later that evening, Thompson—who oversaw general law enforcement at the Fairgrounds—received a phone call from Fairgrounds CEO Rip Rippetoe asking him to come in for a meeting regarding The Fairness Campaign's press release. Thompson, Rippetoe, Dr. Mark Lynn from the Fairgrounds' Board of Directors, Chris Brawner from Fairgrounds' security, and Ellen Benzing from the Fairgrounds' legal staff met "to determine how that protest was going to be handled."    Kentucky Administrative Regulations ("KAR") regarding demonstrations at the

Fairgrounds require 72 hours' notice to the Executive Director of the Fairgrounds. *See* 303 KAR 1:080(2). After the notice is received, the protestors "have to receive a permit from the [F]airgrounds with the specifics of . . . where, [and] the number of people they're going to have so that the[ protestors] can be accommodated." According to Thompson, "[t]hat was [the Fairgrounds'] decision whether they would or would not allow" The Fairness Campaign to protest. Even though The Fairness Campaign did not abide by 303 KAR 1:080(2) and instead only sent out a press release, the Fairgrounds group made a "collective decision" that they would "allow the protest even though sufficient notice had not been given according to KAR regarding protests on [F]airgrounds property." The group decided "to allow the protest to make it relevant to the venue but to keep it in an area that did not disrupt any services that were going on." After the meeting, Thompson led the group out to the parking lot, approximately 50 feet from the sidewalk outside South Wing B, where he suggested an area for the protest. The suggestion was based on handicap-accessible parking because Thompson remembered from previous dealings with The Fairness Campaign, when they had protested the event in prior years, that "there were a few members that were with the group that were handicapped, or if not handicapped they used assistance with canes, wheelchairs and so on." The group agreed with Thompson's recommendations and flagged off the area (the "protest zone") for The Fairness Campaign to use the following morning.

The next morning, twenty-four members of The Fairness Campaign, including the three Plaintiffs, arrived wearing bright orange T-shirts which "enumerated the [KFB]'s discriminatory policies." Thompson met Hartman in the parking lot and told Hartman that The Fairness Campaign would be permitted to protest in the protest zone. Thompson told Hartman that inside the protest zone The Fairness Campaign could use signs, megaphones, "the whole nine yards." The Fairness Campaign then went to the protest zone.

Thompson also warned The Fairness Campaign that they could not disrupt the Ham Breakfast when they went inside. Hartman retorted, "I'm going to do what I have to do," which included the decision to "ramp up activities until the [KFB]'s policies were amended." Thompson recalled that in 2014, twenty-four members of The Fairness Campaign attended the Ham Breakfast wearing bright yellow T-shirts. As other guests went through the buffet line, The

Fairness Campaign stood nearby in a single-file line, alternately facing forward and backward, for 15 to 20 minutes. The Fairness Campaign then got their breakfast and waited until the conclusion of the invocation. When KFB President Mark Haney began introducing dignitaries from the dais, The Fairness Campaign moved in front of the dais and again stood, alternately facing forward and backward, in a single file line for 60 seconds. The Fairness Campaign was not arrested for this behavior.

According to Hartman, Thompson's warning in 2015 not to protest inside the Ham Breakfast caused The Fairness Campaign to rethink its plan. Instead of standing in front of the speaker's dais, The Fairness Campaign decided they would stand silently at their assigned table for 60 seconds. Hartman did not tell Thompson or anyone else from the Kentucky State Police about this change in plan.

Upon leaving the protest zone, Plaintiffs presented their tickets and entered the Ham Breakfast without restriction. The Fairness Campaign was seated together at three tables located in the corner farthest from the front of the speakers' dais. After the opening invocation and as the first speaker began to address the attendees, The Fairness Campaign simultaneously rose from their seats and stood at their three tables silently. This action led to their arrest, although the parties dispute what happened next.

Plaintiffs maintain that immediately after they stood up, police officers approached them, placed Hartman under arrest, and escorted him from the building. Plaintiffs contend none of the officers asked Hartman or other Fairness Campaign members to sit down or leave before arresting him. Thompson, however, testified he approached Hartman and asked him to sit down, but Hartman refused to answer and did not sit down. Drane testified after Hartman was placed into handcuffs, he picked his feet up and had to be "pack[ed] out" of the venue by the troopers. For his part, Hartman stated that after being handcuffed, he "decided, in protest, to dead drop" in response to Defendants' having "jerked [him] forward" when he hesitated to accompany them. Drane subsequently arrested Hartman for failure to disperse and disorderly conduct in the second degree.

After Hartman was arrested and escorted from the Ham Breakfast, Thompson returned to the venue to find other individuals still standing at the table. Thompson testified he told them they had to leave and that all but two women left the Breakfast. Thompson said that although he asked one of the women to leave, she repeatedly stated she was not leaving.

DeVries testified that following Hartman's arrest, Hill approached her and told her she had to leave. DeVries explained to Hill that she was getting ready to leave and was waiting for her friends. DeVries stated that Hill then placed her under arrest and escorted her from the event. Hill, however, claimed that DeVries had already been handcuffed when Thompson asked Hill to escort her out of the Breakfast and that Thompson instructed Hill to charge DeVries with failure to disperse.

Wallace asserted that after Hartman was removed from the Breakfast, troopers approached her and told her she had to leave. Before she was given a chance to respond, Wallace contended that she was removed from the venue and placed under arrest. Thompson arrested Wallace for failure to disperse.

The day before their trials in state court were set to begin, the Jefferson County Attorney moved to dismiss all charges against Plaintiffs. Three judges granted the motions and dismissed the charges.

After the charges were dismissed, Plaintiffs filed a complaint in Jefferson County Circuit Court, asserting four constitutional violations under 42 U.S.C. § 1983: false arrest and malicious prosecution in violation of the Fourth Amendment, and free speech and retaliatory arrest claims in violation of the First Amendment. Plaintiffs also claimed wrongful arrest, malicious prosecution, and battery under Kentucky law. Defendants removed the case to federal court and moved for summary judgment. The district court granted summary judgment to Defendants on all claims, both on the merits and on qualified immunity grounds.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo and view all facts in the light most favorable to Plaintiffs, the non-moving parties. *Brumley v. United Parcel Serv.,*

*Inc.*, 909 F.3d 834, 839 (6th Cir. 2018).  A district court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is not a dispute of material fact when the plaintiff presents only a mere "scintilla" of evidence; there must instead be "evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.  ANALYSIS

### A.  Protest Zone Outside the Ham Breakfast

Plaintiffs allege Defendants violated their First Amendment free speech rights when they were directed to the protest zone outside of the Ham Breakfast.  Although Plaintiffs did not seek a permit as required, they do not make a facial challenge to 303 KAR 1:080.  Instead, they challenge the application of the regulation to them.

Plaintiffs' free speech claim fails because they sued the wrong parties.  Nothing in the record establishes that Drane or Hill was involved with the creation or enforcement of the protest zone.  Therefore, the district court properly granted summary judgment to them on Plaintiffs' free speech claim.

As for Thompson, § 1983 requires that the defendant "subjects, or causes to be subjected" a United States citizen to the deprivation of a constitutional right.  42 U.S.C. § 1983.  Thompson did not "cause" the protest zone to occur.  He recommended its placement in response to a request from the Fairgrounds' Board.  At bottom, Thompson did not have the legal authority to make the decision to put Plaintiffs in the protest zone.  That authority rested with the Executive Director of the Kentucky State Fair.  *See* 303 KAR 1:080(1)(p).  As Thompson testified in his deposition, "[t]hat was [the Fairgrounds'] decision whether they would or would not allow [the protest].  That was . . . governing how the fairgrounds operates once they receive these types of notifications from anyone."  Therefore, Thompson did not "subject" or "cause to be subjected" Plaintiffs to the protest zone and cannot be liable on the free speech claim.

Yet, even if we assume the decision had been Thompson's, there was no constitutional violation. A First Amendment claim depends on three inquiries: (1) whether speech is protected; (2) "the nature of the forum" in which the speech occurs; and (3) whether the government's restriction on speech satisfies the relevant forum's associated constitutional standard. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 559 (6th Cir. 2007). Thompson concedes that the conduct at issue is protected speech, so we focus only on the latter two concerns.

### 1. Type of Forum

There are four types of speech fora: nonpublic, public, designated public, and limited public. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70 (2009); *Miller v. City of Cincinnati*, 622 F.3d 524, 534–35 (6th Cir. 2010). Plaintiffs assert their speech took place on the sidewalks outside of the Fairgrounds entirely. According to Plaintiffs, that means their speech took place in a traditional public forum and any restrictions are subject to strict scrutiny. However, Plaintiffs do not identify any evidence in the record to support this position.

Defendants counter that the protest zone was inside the Fairgrounds in a parking lot, so it was in a limited public forum. Defendants are right. The public cannot access the Fairgrounds unless they pay admission. *See* 303 KAR 1:050. The protest zone was inside the Fairgrounds, approximately 50 feet from the sidewalk outside South Wing B. Therefore, the district court correctly identified the protest zone as inside of a limited public forum. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) ("The Minnesota State Fair is a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion."); *cf. Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (holding that arts festival open to the public at *no charge* on streets of downtown Columbus was traditional public forum).

### 2. Level of Scrutiny

In a limited public forum, the government "is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106

(2001). The government may restrict speech so long as the restrictions are viewpoint neutral and "reasonable in light of the purpose served by the forum." *Miller*, 622 F.3d at 535 (quoting *Good News Club*, 533 U.S. at 106–07) (internal quotation marks omitted). Viewpoint discrimination is a more "egregious" form of content discrimination. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It occurs when speech is restricted because of the speaker's viewpoint on the topic—i.e., but for the perspective of the speaker, the speech would normally be permissible. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (holding school violated free speech clause by denying church access to school premises to show film solely because film had a religious viewpoint).

### a. Viewpoint neutrality

Plaintiffs contend that they were moved to the protest zone because they were protesting the alleged discriminatory policies of the KFB. In their view, Thompson targeted them because of their viewpoint, while Defendants allowed others engaged in political speech to roam freely with signs bearing political messages. These arguments fail for three reasons.

First, the Fairgrounds had a legitimate, viewpoint-neutral reason for designating a protest zone for a large group of people. The Fairgrounds regulations allow demonstrations unless a demonstration unreasonably and substantially interferes with (1) patron safety; (2) "[t]he orderly movement of vehicle and pedestrian traffic"; or (3) the "normal functions" of the Fairgrounds. 303 KAR 1:080(2)(b)(1)–(3). Thompson suggested that the protest zone be located away from the sidewalk in front of South Wing B because 2,000 people needed to enter for the Ham Breakfast. As Thompson explained, the goal is to prevent large groups from "interfer[ing] with folks walking in" because "we can't afford to [allow pedestrians to] back up into traffic" and affect ingress and egress. Nothing in that explanation is troubling. *See, e.g.*, *Heffron*, 452 U.S. at 654 (recognizing that "managing the flow of the crowd" is an "important concern" and holding "that the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations [within the Minnesota State Fair] is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest").

Second, nothing in the record supports Plaintiffs' contention that they were moved because of their viewpoint. Thompson testified that the protest area "was not reserved for [T]he Fairness Campaign, [it] was reserved for anyone who designated themselves a protestor." Thompson continued:

> If you sent an email, a protest notification, *regardless of whom it was for or against*, from a Kentucky State Police perspective you would have been treated as a protestor and been placed in a protest area. . . . The cause and name is absolutely irrelevant. . . . If you send an email that you're a protestor, you will be treated as such.

(Emphasis added). In short, every self-identified protestor would have been placed in a protest zone. This meets the Supreme Court's instruction that a government's action is viewpoint neutral when it treats everyone the same. *E.g.*, *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 694 (2010) ("It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers.").

Third, Plaintiffs have not identified other protestors that remained on the sidewalk; rather, they vaguely assert that others were protesting in the area without providing any detail as to the actions of these individuals that were allegedly protesting. The only evidence in the record regarding other people on the sidewalk comes from Thompson, who testified multiple times that he did not remember any specific signs on the sidewalk. Even taking these facts in the light most favorable to Plaintiffs, we cannot say that other protestors of a different viewpoint were allowed on the sidewalk while Plaintiffs were not.[1] *See Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378–79 (6th Cir. 2007) (holding that the party opposing summary judgment is required to point to evidence in the record that creates an issue of fact).

In sum, Defendants had a viewpoint-neutral rationale for the protest zone.

---

[1]Plaintiffs do not challenge the Fairgrounds regulations on their face, claiming that any and all restrictions on speech in the Fairgrounds violate the Constitution. Instead, Plaintiffs raise only an as-applied challenge, which requires them to show that the regulation was unconstitutional in application to them. However, as stated above, they provide no evidence proving that other large groups were allowed to remain on the sidewalk to protest.

### b. Reasonable in light of purpose served by forum

We next examine whether the protest zone was "reasonable in light of the purpose served by the forum." *Miller*, 622 F.3d at 535. Plaintiffs assert that even if the protest zone was viewpoint neutral, the requirement that protestors indicate their intent to protest before being placed in the protest zone was arbitrary and unreasonable. According to Plaintiffs, the distinction between those registering to protest and those who simply show up and do so arbitrarily favors those who do not register.

The district court did not conduct this analysis. Instead, it said simply, "[i]t appears that Thompson's testimony is the only evidence in the record that bears on the issue of viewpoint neutrality." We see no error in this conclusion. Plaintiffs, who bear the burden of proof, make only the cursory statement that "[a]ny such distinction, based on who issues a press release, and who does not, is not reasonably related to any legitimate government interest." Again, they cite no legal authority for this proposition, and it is not our job to construct a legal argument for them. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Regardless, Thompson's actions were reasonable. Consider the facts here. The Fairgrounds identifies certain fixed locations around the Kentucky State Fair for large demonstrations. 303 KAR 1:080(1). The person or group seeking to demonstrate must apply at least 72 hours in advance. 303 KAR 1:080(2). However, if there is a function at a location "with respect to which no areas for . . . demonstrations have been above designated," one may be temporarily assigned. 303 KAR 1:080(1)(p). Plaintiffs did not submit a timely application, yet the Fairgrounds Board still took steps to accommodate them, and Thompson recommended a protest zone 50 feet from the entrance to South Wing B. In the protest zone, Plaintiffs could speak. They could hold signs. They could have megaphones. They could convey their message to anyone and everyone entering the Ham Breakfast. The only thing they had to do was walk 50 feet across the street—to an area that was equipped with handicapped restrooms for one of their members in a wheelchair, no less—to complain about the Kentucky Farm Bureau. This reasonable accommodation did not violate the First Amendment.

**B. Events Inside South Wing B at the Ham Breakfast**

We turn next to the events inside South Wing B at the Ham Breakfast. This is a private forum, so the rules of engagement between law enforcement and the public are different. Plaintiffs were arrested after they stood up, in unison, at the start of the program. Because Plaintiffs' remaining claims, including false arrest, First Amendment retaliation, malicious prosecution, retaliatory arrest, and battery, depend on whether Defendants had probable cause to arrest them at that moment, we turn to probable cause first.

*Probable Cause.* An officer has probable cause to arrest an individual if "the facts and circumstances within the officers' knowledge [are] sufficient to warrant a man of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox v. Desoto*, 489 F.3d 227, 236 (6th. Cir. 2007) (citing *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)). To determine whether probable cause exists, we consider only "the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The offense establishing probable cause need not be "closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest." [2] *Id.* at 153 (internal quotations omitted). Nor does an officer's subjective motivation invalidate an otherwise lawful arrest based on probable cause. *Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001).

Plaintiffs were arrested for failure to disperse pursuant to Ky. Rev. Stat. § 525.160.[3] Hartman was also arrested for disorderly conduct in the second degree pursuant to Ky. Rev. Stat.

---

[2]The district court predicted that the Kentucky Supreme Court would adopt this holding from *Devenpeck*. *See also Warren v. Lexington-Fayette Urban Cty. Gov't Police Dep't*, No. 5:16-140-DCR, 2017 WL 2888716, at *6 (E.D. Ky. July 6, 2017), *appeal dismissed*, No. 17-5898, 2017 WL 5461670 (6th Cir. Oct. 2, 2017) ("It is therefore reasonable to predict that the Supreme Court of Kentucky would also conclude that an officer has probable cause to arrest as long as he has probable cause [to] arrest for any offense, consistent with *Devenpeck*."). The district court determined that this holding would apply to the state law torts of false arrest and malicious prosecution. Plaintiffs have forfeited any challenge to this conclusion by failing to make any argument about it in their brief. *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018). Consequently, we will also assume that the Kentucky Supreme Court would apply *Devenpeck* to the state law torts.

[3]A person is guilty of failure to disperse "if he participates with two (2) or more persons in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance or alarm, and intentionally refuses to disperse when ordered to do so by a peace officer or other public servant engaged in executing or enforcing the law." Ky. Rev. Stat. § 525.160.

§ 525.060.**⁴** The district court ruled that Defendants had probable cause to arrest DeVries for failure to disperse because she disobeyed an order to leave. We see no error in the district court's conclusion that Defendants had probable cause to believe DeVries had failed or would fail to disperse. The undisputed evidence is that DeVries failed to comply immediately with Defendants' order. Therefore, a reasonable officer would have probable cause to believe she failed to disperse. However, there is a dispute of facts regarding Hartman and Wallace—they contend they were never given a warning to disperse, and Defendants disagree. The district court sidestepped the factual dispute and instead found that the officers had probable cause to arrest all three Plaintiffs under Ky. Rev. Stat. § 525.150 for disrupting a lawful meeting. We agree with the district court's conclusion.

An individual is guilty of disrupting a meeting or procession in the second degree if, "with intent to prevent or disrupt a lawful meeting, procession, or gathering, [1] he or she does any act tending to obstruct or interfere with it physically or [2] makes any utterance, gesture, or display designed to outrage the sensibilities of the group." Ky. Rev. Stat. § 525.150. As the statute's commentary explains, "[i]f the intent to disrupt the meeting is present, the conduct in question need not constitute disorderly conduct per se." Ky. Rev. Stat. § 525.150, cmt.

Plaintiffs admit that they intended to draw attention away from the speaker. *See* Ky. Rev. Stat. § 525.150. Thus, their actions violated the statute two times over. First, they performed an act "tending to obstruct or interfere" with a private event when they stood in synchronization just as the first speaker for the speaking portion of the program was about to begin. Second, this same act was also a "display designed to outrage the sensibilities of the group" because the group's "uniform"—a bright orange T-shirt—listed Plaintiffs' grievances with KFB's policies. *Id.*

---

**⁴**Section 525.060 provides: "A person is guilty of disorderly conduct in the second degree when in a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof, he:

   (a) Engages in fighting or in violent, tumultuous, or threatening behavior;

   (b) Makes unreasonable noise;

   (c) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency; or

   (d) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose."

Plaintiffs assert that § 525.150 does not apply to their silent protest because they "did nothing to prevent or disrupt the [H]am [B]reakfast." Defendants dispute this contention. Thompson testified that "[t]here were a variety of people that walked up to me that thanked me because they could not see when [The Fairness Campaign] stood up." However, even taking the facts in the light most favorable to Plaintiffs and assuming that no one was actually obstructed, Plaintiffs still violated the statute. The statute criminalizes "any act tending to obstruct or interfere" with a meeting. "Tending" to do something is different from actually doing it. *See, e.g.*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/tending (defining "tending" as "to be likely to behave in a particular way or have a particular characteristic"); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/tending (defining "tend" as "to exhibit an inclination"). So long as Plaintiffs' protest tended to draw attention away from the speaker, their conduct was covered by the statute.

Moreover, an officer has probable cause to arrest if he has sufficient knowledge to believe that a crime is about to be committed. *Fox*, 489 F.3d at 236. Thompson knew that the previous year at the Ham Breakfast, members of The Fairness Campaign entered after the invocation, walked in front of the speaker's dais while KFB President, Mark Haney, was speaking, and formed a single-file line for 60 seconds. He also knew, based on his conversation with Hartman an hour before his arrest, that The Fairness Campaign planned to "ramp up" its activities from the previous year. Considering these facts, Thompson had reason to believe that The Fairness Campaign was going to do something more than forming a wall in front of the speaker for 60 seconds. That action would certainly tend to obstruct or interfere physically with the Ham Breakfast in violation of Ky. Rev. Stat. § 525.150.

Finally, Plaintiffs assert that standing in silent demonstration against a speaker or position "is an age old form of political speech at public meetings." That may be true at a *public* meeting. However, Plaintiffs knew that the Ham Breakfast was a private, ticketed event. And most importantly, Plaintiffs did not seek a total silent demonstration. They were unequivocal that their intention was to draw attention to themselves and away from the speaker. As the commentary to Ky. Rev. Stat. § 525.150 explains, "[t]he gist of KRS 525.150 is the intent of the actor rather than the nature of the physical act or the content of the utterance." Considering Plaintiffs'

clearly expressed intent and Defendants' knowledge of that intent, Defendants had probable cause to make the arrests.

With probable cause established, the remaining claims fall like a house of cards.

### 1. Section 1983 and State False Arrest

Plaintiffs assert § 1983 and state false arrest claims. A plaintiff making a claim of false arrest must show the officers lacked probable cause to arrest him or her. *Robertson v. Lucas*, 753 F.3d 606, 615 (6th. Cir. 2014). Thus, if an officer has probable cause to arrest, Plaintiffs cannot maintain an action for false arrest. This is also true of Plaintiffs' state law claim for false arrest. *See Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007). Here, Defendants had probable cause to arrest Plaintiffs, so the district court correctly granted summary judgment to Defendants on the § 1983 and state law false arrest claims.

### 2. First Amendment Retaliation

Plaintiffs also claim that they were arrested in retaliation for the content of their speech.[5] A claim of First Amendment retaliation requires proof that: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between" the first two elements, i.e. "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

The district court ruled that probable cause defeated Plaintiffs' claim for retaliatory arrest, relying on *Hartman v. Moore*, 547 U.S. 250, 265–66 (2006) and *Marcilis v. Township of*

---

[5]Plaintiffs cite *Cohen v. California*, 403 U.S. 15 (1971), for the proposition that they may not be arrested based on the content of their speech. *Cohen* does not help their cause. There, the petitioner was convicted for wearing a jacket with the words "Fuck the Draft" plainly visible in the Los Angeles Municipal Court. *Id.* at 16. The petitioner wore the jacket to make his opposition to the Vietnam War known. *Id.* However, he did not engage in any conduct that would lend itself to probable cause for his arrest under California law. *Id.* at 16–17. The Supreme Court concluded that "the State may not, consistently with the First and Fourteenth Amendments, make the simple public display here involved of this single four-letter expletive a criminal offense." *Id.* at 26. Here, as explained above, Defendants had probable cause to arrest them under Ky. Rev. Stat. § 525.150, which addresses conduct. Plaintiffs' actions were not merely speech, as in *Cohen*.

*Redford*, 693 F.3d 589, 604 (6th. Cir. 2012). *Hartman* established that a plaintiff claiming retaliatory prosecution must plead and prove a lack of probable cause for the prosecution. 547 U.S. at 265–66. Subsequent to *Hartman*, this Court applied the lack of probable cause requirement to retaliatory arrest cases. *See Marcilis*, 693 F.3d at 604 (applying *Hartman* and holding that defendant police officers were entitled to summary judgment on retaliatory arrest claim because officers had probable cause for the arrest). As stated above, Defendants had probable cause to arrest Plaintiffs. Therefore, the district court correctly concluded that Defendants were entitled to summary judgment on the First Amendment retaliation claims.

Plaintiffs do not mention *Hartman* or *Marcilis*, and we have no duty to make an argument distinguishing these cases for them. We would be remiss, however, if we did not address the Supreme Court's recent decision: *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019) held that "probable cause to make an arrest defeats a claim that the arrest was in retaliation for speech protected by the First Amendment." The Court noted that in First Amendment retaliation cases, "it is particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct," and thus, "[b]ecause of the 'close relationship' between the two claims, their related causal challenge should lead to the same solution: The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Id.* at 1724 (citations omitted).[6]

As *Nieves* makes clear, if there is a showing of probable cause, a retaliatory arrest claim fails. Because we affirm the presence of probable cause, Defendants are therefore entitled to summary judgment on the merits of the retaliatory arrest claim. *See id.* at 1728.

### 3. Section 1983 and State Malicious Prosecution

A claim for malicious prosecution under § 1983 requires: (1) that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute" the plaintiff; (2) a lack of probable

---

[6]We note that the *Nieves* Court held "that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1727. Here Plaintiffs have not put forth any objective evidence that similarly situated individuals at the Breakfast had been allowed to engage in similarly disruptive activities without arrest.

cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding; and (4) the criminal proceedings were resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th. Cir. 2010).

Plaintiffs do not show the first necessary element of the § 1983 malicious prosecution claim. They assert only that their prosecution was "initiated by the citations and arrests issued by the [D]efendants against the [P]laintiffs." These conclusory allegations contain no evidence that Defendants participated beyond the initial arrest. Case law in this Circuit is clear that a state trooper is not liable for malicious prosecution by simply sending a police report to the prosecutor's office after an arrest. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005) ("*Skousen . . .* clearly forecloses a malicious prosecution claim based solely on officers' turning over evidence to the prosecuting authorities."). Therefore, the district court properly granted summary judgment to Defendants on the § 1983 malicious prosecution claim.

The elements of malicious prosecution are slightly different for the state law claim, which requires a plaintiff to prove that

1) the defendant initiated, continued, or procured a criminal . . . proceeding. . . against the plaintiff;

2) the defendant acted without probable cause;

3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice . . . ;

4) the proceeding . . . terminated in favor of the person against whom it was brought; and

5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016), *as corrected* (Sept. 22, 2016), *reh'g denied* (Feb. 16, 2017).

The district court ruled that Defendants failed on the state malicious prosecution claim for two reasons: Defendants had probable cause to arrest, and they did not act with malice. We agree with the district court's conclusion. As stated above, Defendants had probable cause to

arrest Plaintiffs.**7**  Therefore, Plaintiffs cannot prove the second element—that Defendants acted without probable cause.

Additionally, Defendants did not act with malice.  Under Kentucky law, an officer acts with malice when he "seek[s] to achieve a purpose other than bringing an offender to justice." *Martin*, 507 S.W.3d at 11.  Malice may be inferred from a lack of probable cause.  *Massey v. McKinley*, 690 S.W.2d 131, 133 (Ky. Ct. App. 1985) (citing *Sweeney v. Howard*, 442 S.W.2d 865 (Ky. 1969)).  Plaintiffs assert only that we should infer malice because they were arrested without probable cause.  However, Defendants had probable cause to arrest Plaintiffs under Ky. Rev. Stat. § 525.150, so we will not make that inference.  Moreover, Thompson's actions after Plaintiffs left the Breakfast show no malice.  He met with The Fairness Campaign members in the parking lot and told them that they would still be allowed to protest outside.  He even offered to put the flags back up around the protest zone after they had been knocked down.

In summary, the district court properly granted summary judgment to Defendants on the malicious prosecution claims.

### 4. Battery

Finally, Hartman alleges that Thompson and Drane used excessive force during his arrest.  Under Kentucky law, an "officer making an arrest may use such force as may be necessary to make the arrest but no more."  *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973); *see also* Ky. Rev. Stat. § 503.090(1).  As stated above, Defendants had probable cause to arrest Hartman.  And it is undisputed that Hartman "decided, in protest, to dead drop" by picking his feet up and forcing the Troopers to carry him out of the Ham Breakfast.  When Kentucky State Troopers had to pick up Hartman and carry him out, they used as much force as necessary.  Therefore, Hartman loses on his battery claim.

### IV.  CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

**7**The language in the Kentucky version of the tort is different than the § 1983 version.  In Kentucky, the defendant need only have "acted without probable cause."  *Id.* at 11.  This is different from the § 1983 version, in which the lack of probable cause is tied to the criminal prosecution.  *Sykes*, 625 F.3d at 308.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

JOHN K. BUSH, Circuit Judge, concurring in part and concurring in the judgment. I agree with the reasoning of the majority opinion in all but one particular. I write separately to express the limits of my rationale for finding that Defendants had probable cause to arrest Plaintiffs.

First, it is unnecessary to address (as did the district court) whether Defendants had probable cause to arrest Sonja DeVries for failure to disperse under Kentucky Revised Statutes § 525.160. *See* Majority Op. at 12. Instead, the arrest was permitted based on Kentucky Revised Statutes § 525.150. The latter statute prohibits a person from, "with intent to prevent or disrupt a lawful meeting, procession, or gathering," either "do[ing] any act tending to obstruct or interfere with it physically or mak[ing] any utterance, gesture, or display designed to outrage the sensibilities of the group." The majority opinion concludes that Defendants had probable cause to arrest all three Plaintiffs under § 525.150, and I agree with that conclusion.

My position in this regard stems from the principle that probable cause is a determination to be made in light of *all* "the facts and circumstances within the officers' knowledge." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citation omitted); *see Beck v. Ohio*, 379 U.S. 89, 91 (1964). Because we may consider everything the officers knew at the time they arrested Plaintiffs, we need not determine whether Plaintiffs' standing at the back of the room, wearing brightly colored T-shirts, would alone "warrant a man of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox*, 489 F.3d at 236 (citation omitted); *see* Majority Op. at 12–14. Here, the totality of everything Defendants knew satisfies the probable-cause standard, so we need not decide whether anything less than that totality would do so.

Defendants knew that the previous year, Plaintiffs had stood in a line at the front of the room, *between* the audience and the speaker, for sixty seconds. They knew that, like the previous year, Plaintiffs again came in a group to the Ham Breakfast. What is more, Hartman

had told Thompson that he would "do what [he had] to do" and planned to "ramp up [his] activities." R. 17-1, Hartman Dep. 32:4–6. Thus, when Defendants saw Plaintiffs stand up as a group, they could reasonably believe—at minimum—that Plaintiffs had the "intent to prevent or disrupt a lawful meeting, procession, or gathering" and were about to commit actions "tending to obstruct or interfere with it physically."[1] Ky. Rev. Stat. § 525.150; *see* Majority Op. at 13. This reasonable belief is all we need to affirm the district court's holding that probable cause supported the arrests.

Therefore, I would not reach whether Plaintiffs' standing in the back wearing bright T-shirts could alone support a probable-cause finding. For the same reason, I would not reach whether Defendants had probable cause to arrest Plaintiffs under the second disjunctive element of the statute, which proscribes "making any utterance, gesture, or display designed to outrage the sensibilities of the group." Ky. Rev. Stat. § 525.150.

In all other respects, I join Judge Suhrheinrich's well reasoned majority opinion.

---

[1]The Dissent suggests that Officer Hill, who arrested DeVries, may not have known about what Hartman told Thompson regarding a plan to "ramp up . . . activities." *See* Dissent at 26–27. But Hill testified, and Plaintiffs do not dispute, that Thompson told him in a briefing session before the Ham Breakfast that "there was a group there that was possibly going to protest and I think last year they like *stood up in front of everybody* so we might be looking at similar acts, but we weren't sure." R. 17-7, Hill Dep. 15:18–21 (emphasis added). Therefore, according to undisputed testimony, Hill was in possession of enough facts to reasonably believe that Plaintiffs were about to again stand between the audience and the speakers—or do more, because, as Hill testified, Defendants "weren't sure" what Plaintiffs' plans were. A reasonable officer could believe that such conduct would tend to obstruct or interfere with the event physically in violation of § 525.150.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. The majority today concludes that although Kentucky State Police Trooper Jeremy Thompson determined where The Fairness Campaign would protest and decided how to implement the Kentucky State Fair's regulations, Thompson cannot be liable under 42 U.S.C. § 1983. The majority also determines that the officers had probable cause to arrest Plaintiffs for disrupting a meeting, thereby foreclosing Plaintiffs' claims for false arrest and First Amendment retaliation. For the following reasons, I respectfully dissent.

## I.  PROTEST ZONE RESTRICTION

The majority first concludes, without any suggestion or argument from the Defendants, that because "Thompson did not have the legal authority to make the decision to put Plaintiffs in the protest zone," but, rather, merely "recommended [the zone's] placement in response to a request from the Fairgrounds' Board," Thompson cannot be liable under 42 U.S.C. § 1983. True, a defendant is liable under § 1983 only if he either "subjects" a plaintiff to a constitutional violation or causes the plaintiff "to be subjected" to a constitutional violation. 42 U.S.C. § 1983. However, although the Kentucky State Fair Board initially determined that, pursuant to 303 Kentucky Administrative Regulation 1:080, The Fairness Campaign could demonstrate, Thompson decided where the protest zone would be located and, critically, Thompson had discretion regarding who, precisely, would be placed in that zone. *See* R. 17-5 (Thompson Dep. at 26) (Page ID #405) (explaining that he decided where the protest zone would be placed); *id.* at 49, 51 (Page ID #428, 430) (noting that the zone "was reserved for anyone who designated themselves a protestor" and that "[i]f you sent an email, a protest notification, . . . *from a Kentucky State Police perspective* you would have been treated as a protestor and been placed in a protest area" (emphasis added)). Similarly, although the regulation at issue applied to "demonstrations," Thompson offered the sole explanation for the protest zone and, in doing so, consistently referred to "protests," rather than demonstrations. *See id.* As explained in further detail below, the word "protest," rather than "demonstration," describes an intent to speak

against a particular cause or event, thereby implicating possible viewpoint discrimination. When a police officer enforces a policy in a way that, as he individually understands it, arguably violates the Constitutional rights of protestors, I do not see how he has not allegedly "subjected" those individuals to Constitutional violations or "cause[d]" those individuals "to be subjected" to Constitutional violations. 42 U.S.C. § 1983. Having determined that Thompson was a correctly named defendant, I turn to the merits of Plaintiffs' First Amendment claim.

Plaintiffs contend that, by forcing them to protest in the designated protest zone, Thompson violated their free speech rights under the First Amendment. Courts addressing First Amendment speech claims focus on three inquiries: (1) whether the communication at issue "is speech protected by the First Amendment"; (2) "the nature of the forum" in which the speech occurs; and (3) "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). As the majority correctly notes, this case turns on the second and third inquiries. Assuming that the protest zone was located in a "limited public forum" under the second inquiry, in order to succeed on their claim Plaintiffs must show that their exclusion to the protest zone was viewpoint discriminatory or unreasonable "in light of the purpose served by the forum." *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *accord Miller v. City of Cincinnati*, 622 F.3d 524, 534–35 (6th Cir. 2010). I believe Plaintiffs have sufficiently established both alternative elements to survive summary judgment.

Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject" and is thus "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). For instance, in *Lamb's Chapel v. Center Moriches Union Free School District*, the Court found unconstitutional a school's regulation which prohibited individuals from using its facilities to discuss family issues from a religious perspective while permitting non-religious discussions on the same topic. 508 U.S. 384, 393–94 (1993). In the current case, Thompson explained that the protest area was designed "for anyone who designated themselves a protestor." R. 17-5 at 49 (Page ID #428). When asked what he understood a "protest" to entail, he explained: "if you show up and your cause is *contrary to* an event that's being held inside and you are

demonstrating your views that are *to the contrary* and you're doing that in some demonstrative way, then you're obviously protesting.  There's a variety of ways you can protest."  *Id.* at 49–50 (Page ID #428–29) (emphasis added).

Viewed in the light most favorable to Plaintiffs, this comment—made by the officer in charge of enforcing the Board's regulation—raises a genuine dispute of material fact as to the viewpoint neutrality of the restriction.  Specifically, as articulated by Thompson, individuals who appeared to speak *in favor of* the KFB's policies would not be placed in the protest area, because their views would not be "contrary to an event" taking place in the South Wing.  *See id.* Furthermore, although the regulation at issue (303 Kentucky Administrative Regulations 1:080) uses the word "demonstrations," Defendants have repeatedly characterized the restriction as focusing on "protests," a word that naturally refers to individuals who are *against* a certain issue or policy, rather than in favor of it.  *See, e.g.*, Appellees Brief at 6, 8, 11; R. 17 at 27 (Defs. Mot. Summ. J.) (Page ID #101) (describing the designated area as a "protest area"); *see also Protest*, Oxford English Dictionary (3d ed. 2018) (defining the common meaning of protest as "any action, act, or statement expressing (emphatic) objection to or dissent from something"); *Protest*, Merriam-Webster Unabridged (2016) (defining a protest as "a solemn declaration of disapproval: a formal or public remonstrance").  Defendants' counsel also repeatedly referred to this area as a "protest zone" during oral argument, thus reinforcing this particular interpretation.  The natural outcome of such a restriction—and Thompson's decision to implement it against the Plaintiffs— is to distinguish among speakers based on the viewpoint they espouse; even in a limited public forum, this cannot withstand constitutional scrutiny.  *See Lamb's Chapel*, 508 U.S. at 394 ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984))).

Additionally, even if the regulation were written and applied to Plaintiffs in a viewpoint-neutral way, I would still conclude that Plaintiffs had sufficiently established a constitutional violation because, as articulated by Thompson, the regulation was not "reasonably related to the purpose of the forum."  *Miller v. City of Cincinnati*, 622 F.3d 524, 536 (6th Cir. 2010); *see also Pleasant Grove City*, 555 U.S. at 470.  Neither Defendants nor the district court addressed the

reasonableness of the restriction imposed on Plaintiffs, and it is unclear from either this record or Defendants' briefing what purpose the forum was meant to achieve. There are, of course, conceivable purposes served by the fairgrounds or the protest area during the Kentucky State Fair, including ensuring that the greatest number of people can efficiently and safely pass through the vendor areas inside and outside the South Wing. In the context of reasonable time, place, and manner restrictions, the Supreme Court has recognized the government's substantial interest in crowd control at a heavily attended event. *See Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649–50, 654 (1981) (determining that the state had a substantial interest in restricting leafleting to a specific area during the ticketed Minnesota State Fair based, in part, on the need to maintain crowd control given the large number of attendees and exhibitors). However, even assuming that the "purpose" of the forum included efficient crowd control, the regulations in place in 2015 are not "reasonable" in light of that purpose.

As Thompson testified, the Board's restriction in August 2015 applied only to those who had designated themselves as "protestors." R. 17-5 at 49 (Thompson Dep.) (Page ID #428). During oral argument, counsel for Defendants reinforced this reasoning when he explained that if individuals arrived to explain that they were in favor of the KFB but had not designated themselves as protestors, they would not have been required to go to the protest area.

This distinction—between individuals who designate themselves as protestors and those who do not—is not "reasonably related to the purpose of the forum." *Miller*, 622 F.3d at 536. Efficient crowd control is necessarily undermined if, despite failing to alert the fairgrounds of their intent to protest, a group is permitted to demonstrate on the sidewalk outside the South Wing and thus trigger the same concerns raised by The Fairness Campaign's actions. Again, counsel for Defendants made this explicit when, during oral argument, he noted that since 2015, The Fairness Campaign has not announced their intent to protest and have been permitted to engage in the *exact same* actions on the sidewalk outside the South Wing.

This court's decision in *Miller v. City of Cincinnati* is instructive. In *Miller*, we affirmed a grant of a preliminary injunction restraining the city from enforcing its regulation that required private organizations to secure a city official's sponsorship to hold expressive activities in city hall, but did not require the official actually to attend the organization's event. 622 F.3d at 536.

Noting that the purpose of the forum (city hall) was to allow city officials to exercise their responsibilities under the City Charter, we concluded that although the regulation was facially viewpoint neutral, the restriction "b[ore] little relationship" to the purpose of the forum, since officials were not required to attend the events they sponsored. *Id.*; *see also City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the . . . rationale for restricting speech in the first place."); *Saieg v. City of Dearborn*, 641 F.3d 727, 738 (6th Cir. 2011) ("[E]ven when a regulation promotes a government interest that would be achieved less effectively absent the regulation, the government's interest may still be insubstantial if the regulation burdens substantially *less* speech than is necessary to further the government's interest."); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87–88 (1st Cir. 2004) (determining that the defendants' justification for the restriction—protecting children from particular advertisements—was undermined, in part, because "there is evidence that the MBTA's rejection of these advertisements does not actually serve the alleged purpose"). Because Plaintiffs' placement in the protest area is not "reasonably related to the purpose of the forum," I would conclude that such confinement violated their First Amendment rights.

Finally, although the majority does not reach this issue, I would hold that Thompson[1] is not entitled to qualified immunity for excluding Plaintiffs from the protest zone. Specifically, by applying the regulation against Plaintiffs in a way that was either viewpoint discriminatory (protestors v. non-protestors) or unreasonable in light of the purpose of the forum (self-designated protestors v. non-designated protestors), Thompson violated Plaintiffs' clearly established constitutional rights in such a way that "every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). It is clearly established, both by the Supreme Court and in

---

[1]Plaintiffs have not identified any evidence suggesting that the other individually named defendants, Trooper Jason Drane and Trooper Brian Hill, were involved in the decision to move Plaintiffs to the protest area, or that they interacted with Plaintiffs in any way prior to Plaintiffs' entrance into the breakfast. Rather, Thompson testified that he did not observe any other officer, besides himself, interact with Plaintiffs before the breakfast began, R. 17-5 at 95 (Thompson Dep.) (Page ID #474), and Drane explained that he did not order any member of The Fairness Campaign to move to a different location, R. 17-8 at 5–6 (Drane Dep.) (Page ID #651–52). Because Plaintiffs "must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right," *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011) (internal quotation marks omitted), Drane and Hill are entitled to qualified immunity on this claim.

this Circuit, that even in limited public fora, regulations on speech must be viewpoint neutral and reasonable; because Thompson's actions fail this basic and well-established standard, he is not entitled to qualified immunity. *See Lamb's Chapel*, 508 U.S. at 390.

## II. WRONGFUL ARREST CLAIMS

The majority also dismisses Plaintiffs' claims for wrongful arrest predicated on their arrests for failure to disperse and (for Chris Hartman) disorderly conduct during the Ham Breakfast. Specifically, the majority concludes that (1) Defendants had probable cause to arrest Sonja DeVries for failure to disperse and (2) although there was a genuine issue of material fact as to whether Defendants had probable cause to arrest Chris Hartman and Carla Wallace for failure to disperse, Defendants nonetheless had probable cause to arrest them for an entirely different crime: disrupting a public meeting pursuant to Kentucky Revised Statutes 525.150. I disagree with both conclusions.

## A. DeVries Arrest for Failure to Disperse

Plaintiffs asserting a claim of false arrest must show the officers lacked probable cause to arrest them. *See Wesby*, 138 S. Ct. at 585–86; *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014). An officer has probable cause to arrest an individual if "the facts and circumstances within the officers' knowledge [are] sufficient to warrant a [person] of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

DeVries was arrested for failure to disperse pursuant to Kentucky Revised Statutes 525.160. "A person is guilty of failure to disperse if he participates with two (2) or more persons in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance or alarm, and intentionally refuses to disperse when ordered to do so by a peace officer or other public servant engaged in executing or enforcing the law." Ky. Rev. Stat. Ann. 525.160.

The district court determined that because DeVries stated she was "waiting for a friend" when an officer ordered her to leave the breakfast, there was probable cause to arrest her for failure to disperse. R. 31 at 7–8 (Op.) (Page ID #770–71). However, when viewed in the light most favorable to Plaintiffs, DeVries did not refuse to follow Hill's orders; rather, she stated she was "getting ready to leave," suggesting she was, in fact, going to comply with Hill's directive. R. 17-3 at 24–25 (DeVries Dep.) (Page ID #264–65). Instead of providing DeVries any time to comply, Hill immediately arrested her.

Second, even if Hill had probable cause to believe that DeVries's statement constituted a refusal to leave, Hill lacked probable cause under the other provisions of Kentucky Revised Statutes 525.160. Specifically, to be arrested for failure to disperse, an individual must be engaged in "disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance or alarm." Disorderly conduct, in turn, requires a person in a public place to, among other things, "[c]reate[ ] a hazardous or physically offensive condition by any act that serves no legitimate purpose." Ky. Rev. Stat. Ann. 525.060. Even assuming the breakfast constituted a "public place,"[2] Plaintiffs claim that at the time of DeVries's arrest they were standing in the back of a large venue, there were 2,000 people present, no one was sitting behind them, and DeVries was standing for approximately thirty seconds before she was arrested. *See* R. 17-1 at 33 (Hartman Dep.) (Page ID #156); R. 17-3 at 25 (DeVries Dep.) (Page ID #265). And although Defendants assert that the officers had probable cause to believe that DeVries was *about* to engage in actions necessitating a request to disperse, it is not clear on this record whether Hill— the arresting officer—was aware that Hartman had told Thompson he intended to "ramp up" the protests. *See* 17-7 at 15 (Hill Dep.) (Page ID #633) (explaining that Thompson had told him that

---

[2]Under Kentucky Revised Statutes 525.010(3), a "public place" is "a place to which the public or a substantial group of persons has access and includes but is not limited to highways, transportation facilities, schools, places of amusements, parks, places of business, playgrounds, and hallways, lobbies, and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence. An act is deemed to occur in a public place if it produces its offensive or proscribed consequences in a public place." Defendants repeatedly assert that the breakfast was a *private* event that was *not* open to the public. *See* Appellees Brief at 9, 20, 26 n.2; *cf. Maloney v. Commonwealth*, 489 S.W.3d 235, 241 (Ky. 2016) (determining that a person's porch was "open at least to limited access by the general public"); *Thompson v. Commonwealth*, No. 2015-CA-001930-MR, 2018 WL 1687692, at *2–3 (Ky. Ct. App. April 6, 2018) (determining that the driveway outside a home was sufficiently open to the public to constitute a "public place" and affirming denial of a directed verdict); *but see Hendricks v. Commonwealth*, 865 S.W.2d 332, 334–35 (Ky. 1993) (concluding that a city's prohibition on nudity in "public places" applied to a private establishment that was open to any individual who paid a door fee).

there was a group "that was possibly going to protest" but not detailing Hartman's conversation with Thompson); *King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017) (noting that, when conducting a qualified-immunity analysis, courts must examine only the facts that each officer knows).**[3]**

Finally, there is no evidence in the record that anyone in the KFB was actually annoyed or offended by DeVries's actions; rather, Thompson testified that no one from the KFB played any role in how he and the other officers dealt with the volunteers. R. 17-5 at 70 (Thompson Dep.) (Page ID #449); *see also Commentary*, Ky. Rev. Stat. Ann. 525.060 (1974) ("[A] person may not be arrested for disorderly conduct as a result of activity which annoys only the police."); *accord Kennedy v. City of Villa Hills*, 635 F.3d 210, 215–16 (6th Cir. 2011) ("Kentucky law does not criminalize arguments and noise that disturb only police officers because such conduct does not risk *public* alarm."); *see also* R. 17-7 at 6–7 (Hill Dep.) (Page ID #624–25) (explaining that Hill did not recall that the speaker stopped talking when Plaintiffs stood up and explaining he did not remember whether anyone from the surrounding tables got up and moved). Taken in the light most favorable to DeVries, a reasonable jury could determine that standing up silently in the back of a large, heavily populated room does not create "a hazardous or physically offensive" condition, Ky. Rev. Stat. Ann. 525.060, and standing for thirty seconds is not a *serious* inconvenience or annoyance, particularly when it does not block anyone's view, Ky. Rev. Stat. Ann. 525.160; *cf. United States v. Edmundson*, 405 F. App'x 964, 966 (6th Cir. 2010) (determining that a person had engaged in actions likely to alarm his neighbors under Kentucky Revised Statutes 525.060 when he screamed at the top of his lungs that someone was trying to kill him); *Nails v. Riggs*, 195 F. App'x 303, 309 (6th Cir. 2006) (concluding that there was a genuine issue of material fact as to whether the plaintiff's action of requesting car keys from an officer and "gesticulating erratically" would create a hazardous or physically offensive condition); *Commonwealth v. Jones*, 880 S.W.2d 544, 546 (Ky. 1994) (concluding sufficient

---

**[3]**The Concurrence notes that Hill was aware of The Fairness Campaign's protest the previous year and that the officers were not "sure" what would happen at the 2015 event. Concurrence at 19 n.1. However, as explained in further detail below, at the time DeVries was arrested in 2015, it would have been apparent that the protestors were not engaging in similar (or more severe) conduct as the 2014 protest.

evidence existed to convict a suspect for disorderly conduct after she screamed obscenities during a parade).

Consequently, I would conclude that there are at least genuine issues of material fact as to whether Hill lacked probable cause to arrest DeVries for failing to disperse. Furthermore, based on the above-cited case law, because no reasonably competent officer would have found probable cause given these facts, I would find that Hill is not entitled to qualified immunity. *Wesby*, 138 S. Ct. at 584; *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006) ("It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." (internal quotation marks omitted)).

**B. Arrests for Disruption of a Meeting**

As noted above, rather than rely on Plaintiffs' arrests for failure to disperse or disorderly conduct, the district court and the majority instead conclude that Defendants had probable cause to arrest Plaintiffs for an entirely separate crime: disrupting a meeting or procession under Kentucky Revised Statutes 525.150. R. 31 (Order at 8–9) (Page ID #771); *see also Devenpeck*, 543 U.S. at 153–54 (concluding that because an officer's subjective motivation does not invalidate an otherwise lawful arrest based on probable cause, the Court would reject a rule requiring "that the offense establishing probable cause [ ] be 'closely related' to, and based on the same conduct as, the offense identified by the arresting office at the time of arrest"). Although I have serious reservations about a district court's authority to raise an alternative basis for a plaintiff's arrest for the first time in an order granting summary judgment to a defendant[4], I also believe the majority is incorrect on the merits.

---

[4]In this case, for instance, Plaintiffs had no opportunity before summary judgment was ordered to respond to the possible applicability of Kentucky Revised Statutes 525.150. Furthermore, because Defendants did not rely upon the statute in their motion for summary judgment, Plaintiffs were not on any reasonable notice regarding this basis for summary judgment. Although *Devenpeck* permits officers to point to other statutes to support a finding of probable cause, 543 U.S. at 152, it is not clear that courts, rather than parties, may locate and examine these alternative crimes sua sponte. This is particularly true if the alternative offense forms the basis for an order granting summary judgment against the plaintiffs.

In Kentucky, a person disrupts a meeting or procession in the second degree if, "with intent to prevent or disrupt a lawful meeting, procession, or gathering, he or she does any act tending to obstruct or interfere with it physically or makes any utterance, gesture, or display designed to outrage the sensibilities of the group." Ky. Rev. Stat. Ann. 525.150. Citing no case law, the district court determined probable cause existed primarily due to Hartman's earlier comment to Thompson that the protestors intended to "ramp up" their protests, as well as Thompson's knowledge of their protest in 2014. *See* R. 31 at 9 (Op.) (Page ID #772). Defendants likewise contend that they were not required to wait for Plaintiffs to disrupt the meeting, asserting instead that there was probable cause to believe that Plaintiffs were *about* to disrupt the meeting. Appellees Brief at 20. Such speculative assumptions are insufficient to support a finding of probable cause.

Although Hartman told Thompson they intended to "ramp up" the protests, it is unclear whether Hartman was referring to their protests outside or inside the breakfast. Furthermore, even if Plaintiffs did intend to ramp up their protest within the breakfast, none of their actions at the breakfast that morning confirmed this. Specifically, the previous year, the protestors not only stood near the buffet line in an organized line for approximately fifteen to twenty minutes, but also walked out of the breakfast and into the lobby in order to reenter the venue later at the front of the stage. R. 17-1 at 23 (Hartman Dep.) (Page ID #146). In contrast, in 2015, Plaintiffs did not protest near the buffet line, but rather entered the breakfast and were seated at the back of the room. *Id.* at 33 (Page ID #156). They did not walk into the lobby before the beginning of the event and were instead stationed "along the wall that abutted the back of the auditorium." *Id.* Finally, Plaintiffs rose in unison when the first speaker began to address the crowd. *Id.* at 35–36 (Page ID #158–59). Rather than wait any period of time to observe whether Plaintiffs would begin to walk toward the stage, speak loudly, or engage in any other type of physical interference, Plaintiffs were prematurely arrested, despite the fact that Plaintiffs did not block anyone's view to the stage. R. 17-1 at 33 (Page ID #156). Even with Thompson's knowledge of their past protests, none of the circumstances in 2015 suggested that Plaintiffs intended to do anything more than stand silently in the back of a heavily attended event for a few seconds or, even more innocuously, simply stand up to leave the venue, a common tactic taken by protestors during public meetings. Without more, there was insufficient evidence suggesting that Plaintiffs'

actions obstructed or interfered with—or were about to obstruct or interfere with—the breakfast "physically." *See McCurdy v. Montgomery County*, 240 F.3d 512, 519 (6th Cir. 2001) (concluding that an officer lacked probable cause to arrest an individual for public intoxication in part because the officer testified "he could only 'speculate' on the 'one of a million things' that might occur if he did not arrest" the suspect).

Defendants also lacked probable cause to arrest Plaintiffs under the second provision of Kentucky Revised Statutes 525.150, which describes individuals engaged in "utterance[s], gesture[s], or display[s] designed to outrage the sensibilities of the group." Setting aside the questionable constitutionality of such a provision, the limited commentary on this statute suggests that "KRS 525.150 is aimed at that conduct which is likely to produce *imminent violence.*" Ky. Rev. Stat. Ann. 525.150, cmt. (emphasis added). There is no evidence in the record, and Defendants have never contended, that Plaintiffs' actions caused or were likely to produce imminent violence. Furthermore, Plaintiffs were permitted to enter the event without incident, despite wearing t-shirts that enumerated the contested policies of the KFB. There is no evidence that anyone besides Defendants considered Plaintiffs' presence or their silent protest to be "offensive" to the "sensibilities of the group."[5]

Along with having insufficient evidence to arrest Plaintiffs for this offense, the fact that Kentucky Revised Statutes 525.150 is a misdemeanor further reinforces the deficiencies of the arrests. Under Kentucky and federal law, officers are permitted to arrest Plaintiffs for a misdemeanor if the offense was "committed in his or her *presence.*" Ky. Rev. Stat. Ann. 431.005(1)(d) (emphasis added); *see also* Ky. Rev. Stat. Ann. 431.015(1)(b)(3) (permitting an officer to conduct a warrantless arrest, rather than issue a citation, if (1) the misdemeanor is "committed in his or her presence" and (2) the misdemeanor is "[a]n offense in which the defendant refuses to follow the peace officer's reasonable instructions"); *Atwater v. City of Lago*

---

[5]Although Plaintiffs all conceded that, by wearing the same color t-shirts and standing up in unison, they intended for people to notice them, Wallace also explained that their intent was to educate the public as to the KFB's policies. Education is hardly something designed to enrage the sensibilities of a group, particularly if the message being conveyed is one Plaintiffs contend very few people in attendance were aware of. *See, e.g.*, R. 17-1 at 34–35 (Hartman Dep.) (Page ID #157–58) (explaining that they wore the same color t-shirts to draw attention to the group); R. 17-3 at 19 (DeVries Dep.) (Page ID #259) (same); R. 17-4 at 16 (Wallace Dep.) (Page ID #316) (same); R. 17-4 at 44 (Wallace Dep.) (Page ID #344) (explaining that the primary point of their demonstration was to educate the public about the policies, rather than persuade people who support the policies to change their minds).

*Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Thompson testified that he understood this limitation. R. 17-5 at 128 (Thompson Dep.) (Page ID #507). As noted above, merely standing silently in the back of a large auditorium does not physically interfere with a meeting and none of Plaintiffs' actions constituted a "display designed to outrage the sensibilities of the group." Thus, even if Defendants believed that Plaintiffs' actions would soon devolve into an unlawful obstruction, I do not believe that this suspicion, without more, permitted them to arrest Plaintiffs for a misdemeanor without a warrant. Furthermore, because no reasonable officer could conclude, under these circumstances, that Plaintiffs were committing a misdemeanor in the presence of Defendants, I would deny Hill, Thompson, and Drane qualified immunity.

## III. FIRST AMENDMENT RETALIATION

Along with asserting that Defendants lacked probable cause to arrest them, Plaintiffs contend their arrests constituted First Amendment retaliation. R. 1-2 ¶¶ 21, 33 (Am. Compl.) (Page ID #14–16). In order to assert a claim for retaliatory arrest, a plaintiff must show:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Notably, while the Supreme Court has recently clarified that, with an important caveat,[6] "[t]he presence of probable cause should generally defeat a First Amendment retaliatory arrest claim," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019), because I conclude that Defendants lacked probable cause to arrest the Plaintiffs, my analysis focuses on the elements established in *Thaddeus-X*.

---

[6]As the majority notes, the Supreme Court in *Nieves* held that, notwithstanding the general rule that probable cause defeats a claim for a retaliatory arrest under the First Amendment, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1727. Because I conclude that Defendants lacked probable cause to arrest Plaintiffs, I need not rely on this exception to the *Nieves* holding.

## A. Protected Conduct

As for the first prong, engaging in a protest would generally be considered "protected conduct." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007). In response, Defendants asserted in their motion for summary judgment that Plaintiffs did not have a First Amendment right to protest within a private venue and, therefore, were not conceivably engaged in "protected conduct." *See* R. 17 at 32–37 (Defs. Mot. Summ. J.) (Page ID #106–11). Although Defendants failed to reiterate this argument on appeal (and have therefore conceivably waived it), I believe it nonetheless fails as a matter of law. First, although a person may arguably be removed from private *property* based on the content of their speech, *see United States v. Kokinda*, 497 U.S. 720, 725–26 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business"), Defendants have not demonstrated that the KFB's sponsorship of the event turned what was otherwise state-owned land—the South Wing—into private property. Defendants point to a sponsorship agreement between the KFB and the Board for support, but (1) that agreement dealt with the Pride of the Counties Exhibit that the KFB sponsored, *not* the breakfast; and (2) the agreement explained only that the KFB was an exclusive sponsor of the event. It was therefore not a "lease" and did not provide that the KFB was otherwise permitted to exclude individuals; rather, the Board retained the responsibility to "produce" the event. *See* R. 17-1 at 1–3 (Sponsorship Agreement) (Page ID #185–87). The KFB's lack of complete control over the event is further shown by the fact that it was the Board and the Defendants, *not* the KFB, that determined that Plaintiffs would be removed from the venue and prohibited from protesting at the breakfast. *See, e.g.*, R. 17-5 (Thompson Dep. at 70) (Page ID #449) (testifying that the KFB played no role in determining how the Board and Thompson dealt with The Fairness Campaign). Because the Board maintained control over the breakfast and opened up the event to discussion of a particular topic—the KFB breakfast agenda—at most the breakfast constituted a limited public forum that was being monitored by Defendants.

Second, to the extent the KFB had an exclusive permit to hold the breakfast, Defendants were still not permitted to exclude Plaintiffs from this limited public forum based on the viewpoint of Plaintiffs' speech. Although some cases have found that private, permitted events

in otherwise public fora may exclude individuals based on the viewpoint of their speech in certain circumstances, these cases are distinguishable. *See Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 559 (1995) (determining that Massachusetts's law prohibiting discrimination in public accommodations violated the First Amendment when it "require[d] private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey"); *Sistrunk v. City of Strongsville*, 99 F.3d 194, 196, 198–99 (6th Cir. 1996) (discussing *Hurley* and determining that the City did not violate the plaintiff's First Amendment rights when the city "permit[ed] the Bush-Quayle '92 Committee to exclude members of the public from a traditional public forum based on the content of their speech," including instructing a person to remove their pro-Clinton button).

The decisions in *Sistrunk* and *Hurley* were based in large part on the plaintiff's level of involvement in the expressive activity of the parade and political rally. *See Hurley*, 515 U.S. at 573–74 (noting that Massachusetts's law would require the parade organizers to place individuals in the parade); *Sistrunk*, 99 F.3d at 199–200 (explaining that the organizers "sought to assemble in order to convey a pro-Bush message to the media by use of pro-Bush speakers and largely pro-Bush attendees," and that requiring the Committee to permit an individual who supported a contrary message "would alter the message the organizers sent to the media and other observers"). Unlike participants in a parade or rally (who are often actively involved in creating and reinforcing the message of the sponsoring group), Plaintiffs were merely audience members of an organization-sponsored event in which various political views and opinions were expressed. Furthermore, unlike a participant in a parade, Plaintiffs silently stood in the back of the event and did not block anyone's view to the stage. *See McGlone v. Metro. Gov't of Nashville*, 749 F. App'x 402, 407 (6th Cir. 2018) (distinguishing *Sistrunk* by noting that the *McGlone* plaintiffs were not attempting to participate in a pro-LGBT event and providing, as a counter-example, "a MAGA-hatted man claiming a First Amendment right to stand behind Hillary Clinton at a campaign rally"). Consequently, to the extent Defendants' argument is even reviewable, it does not render Plaintiffs' protest in the Ham Breakfast non-protected conduct.

## B.  Adverse Action

As to the second prong, there can be no serious dispute that arresting a person is an "adverse action [which] would deter a person of ordinary firmness from continuing to engage in that conduct." *Thaddeus-X*, 175 F.3d at 394; *see also Springboro*, 477 F.3d at 822 (determining that a two and one-half hour detention by the police was sufficiently adverse).

## C.  Causal Connection & Discriminatory Motive

To meet the last element of First Amendment retaliatory arrest, Plaintiffs must identify sufficient evidence showing that their arrests were "motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X*, 175 F.3d at 394.  Importantly, "[b]ecause direct evidence of motive is difficult to produce, claims involving proof of a defendant's intent seldom lend themselves to summary disposition and circumstantial evidence may provide sufficient evidence of retaliatory intent to survive summary judgment."  *Kennedy*, 635 F.3d at 218 (internal quotation marks omitted).

Although Defendants contend that they arrested and removed Plaintiffs from the venue due only to their physical disruption, *see* Appellees Brief at 33–34, I believe that evidence in the record supports a contrary conclusion.  First, Thompson explained that an individual was engaged in a "protest" if he or she "show[s] up and [their] cause is contrary to an event that's being held inside and [they] are demonstrating [their] views that are to the contrary and [they're] doing that in some demonstrative way, then [they're] obviously protesting."  R. 17-5 at 49–50 (Thompson Dep.) (Page ID #428–29).  Thompson explained repeatedly that he arrested Plaintiffs because they were being disruptive due to their protest, i.e., due to actions which were "contrary to" the KFB breakfast.  *See id.* at 85 (Page ID #464) (testifying that he told Hartman "I'm promising you, if you protest inside, it's not going to be good.  Your protest area is outside"); *id.* at 103 (Page ID #482) (explaining that in order to disrupt a meeting, "[i]t can simply be you are contrary to the decorum of an event or to a room, especially when you have been forewarned that there would not be any type of protest permitted inside this venue").  Furthermore, Thompson had been to the breakfast in 2014 and received The Fairness Campaign's press release; he was thus aware of The Fairness Campaign's viewpoint vis à vis the KFB.  *See id.* at 29–30 (Page ID

#408–09); R. 17-2 at 1–2 (The Fairness Campaign Announcement) (Page ID #239–40). Similarly, both Hill and Drane testified that they were aware of Plaintiffs' intent to "protest" and that The Fairness Campaign had previously protested the breakfast (and thus the KFB) in 2014. *See* R. 17-7 at 15 (Hill Dep.) (Page ID #633) (explaining that "I think last year they like stood up in front of everybody"); R. 17-8 at 8 (Drane Dep.) (Page ID #654). As noted above, unlike the word "demonstrate," "protest" implies an intention to speak against a particular cause or event.

Even more suggestive of a viewpoint discriminatory motive is Defendants' own brief. Specifically, in asserting that Defendants had probable cause to arrest Plaintiffs for disrupting a meeting, Defendants explain the disruption in terms of Plaintiffs' offensive message. *See* Appellees Brief at 9 ("[T]he disruption functioned as a strategic attempt to promote a protest at the expense of both KFB and the sensibilities of persons who had gathered for the breakfast instead of the aims of The Fairness Campaign."); *id.* ("[T]he group was out of order, interfering with, and obstructing KFB's objectives."); *id.* at 20 (explaining that Plaintiffs were "creating an unjustified distraction by standing with the signage of bright orange t-shirts all of which highlighted KFB's disputed policies" and noting Plaintiffs were "engaging in a group protest that was competing with and out of order for KFB's program").

Considered in the light most favorable to Plaintiffs, this evidence supports an inference of discriminatory motive based on the viewpoint of Plaintiffs' speech. Put simply, there are genuine issues of material fact as to whether Defendants would have arrested individuals who stood up to express a message which was *supportive* of the KFB, rather than engaging in a "protest" against the breakfast. Consequently, Defendants have also not illustrated "that [they] would have taken the same action in the absence of the protected activity." *Springboro*, 477 F.3d at 821 (internal quotation marks omitted); *id.* at 823–24 (concluding that although the officers would have stopped the plaintiffs' car regardless of their anti-abortion speech, once the officers had determined the plaintiffs did not pose a security risk, their extended detention was unwarranted). Furthermore, because "it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983," *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997), I would not extend qualified immunity to Defendants. *See also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111–12 (2001)

(affirming the Court's previous holding "that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a [disfavored] viewpoint").

## IV. CONCLUSION

For all the reasons stated above, I respectfully dissent. Because I believe Thompson was a correctly named Defendant and that there are genuine issues of material fact regarding whether Plaintiffs' placement in the protest zone was constitutional under the First Amendment, I would allow this claim to proceed to trial. Furthermore, because Plaintiffs have established genuine issues of material fact regarding their arrests during the Ham Breakfast, as well as Defendants' motives in making the arrests, I would reverse the district court's order dismissing Plaintiffs' wrongful arrest and First Amendment retaliation claims.